IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| RICKEY L. MCGEE #2173658 | § | |
| VS. | § | CIVIL ACTION NO. 6:23cv486 |
| FNU MITCHELL, et al. | § | |

<u>REPORT AND RECOMMENDATION</u>
<u>OF THE UNITED STATES MAGISTRTE JUDGE</u>

Plaintiff Rickey L. McGee filed a *pro se* complaint under 28 U.S.C. § 1983 complaining of alleged violations of his constitutional rights as a prisoner in the Texas Department of Criminal Justice (TDCJ). The lawsuit was referred to the undersigned United States Magistrate Judge for findings of fact, conclusions of law, and recommendations for the disposition of the case.

Before the Court is the motion by Defendants Issah, Brannan, Foust, Lakin, Rutledge, and Smith seeking summary judgment due to Plaintiff's failure to exhaust administrative remedies. (Dkt. #21.) Plaintiff responded in opposition to the motion, and Defendants replied in support of it. (Dkt. #22, 23.) The motion for summary judgment is now ripe for review. For the reasons explained below, the undersigned recommends that the motion be granted.

**I. Plaintiff's Allegations**

Plaintiff alleges that on June 6, 2023, he was strip-searched, handcuffed, and taken to an office to talk with Defendant Captain Brannan[1] about a PREA[2] complaint he had filed. (*Id.* at 6.)

---

[1] Plaintiff's misspellings of certain Defendants' names are corrected herein to the names provided by Defendants in their pleadings.

[2] The Prison Rape Elimination Act of 2003, 34 U.S.C. §§ 30301, et seq., is concerned with the reporting and prevention of rape in all state and federal prisons.

Captain Brannan, Sergeant Rutledge, and Lieutenant Foust were in the office when he arrived, and Foust sent the escort officer away. (*Id.*) Foust was visibly angry and ordered Plaintiff to sit down. When Plaintiff did not comply quickly enough, Foust pushed Plaintiff into a chair and slapped him in the face. (*Id.*) Foust then pushed Plaintiff to the floor and placed his knee on the back of Plaintiff's neck until Plaintiff lost consciousness. Plaintiff awoke to Brannan's kicking him in the abdomen and genitals and warning that if he received any more PREA complaints from Plaintiff, Plaintiff would not "leave out alive." (*Id.*)

Foust sat Plaintiff back in the chair, spat in his face, and threatened him with physical and sexual violence. (Dkt. #1 at 7.) Brannan said they all knew about Plaintiff's "bullshit lawsuits" and about his assault on a female officer Boykin, which Plaintiff says was at issue in a previous lawsuit he filed. Plaintiff was bleeding from the mouth and delirious and asked for medical attention. Brannan denied medical attention and told Plaintiff to "heal up." (*Id.*)

Plaintiff was then taken to a holding cage where Defendant Foust ordered him to strip. (*Id.* at 7.) Plaintiff protested that he had already been strip-searched before the meeting with Brannan, and Brannan responded to the effect that "either you show us your asshole or we gas you and then look up there ourselves the hard way." (*Id.*) Plaintiff then submitted to the strip search and Defendants Foust and Brannan laughed as they told him to "bend over and hold in that position" repeatedly. (*Id.* at 7–8.) Plaintiff was forced to hold this position while TDCJ officers and other workers, both male and female, were walking past, some of whom made derogatory remarks. (*Id.* at 8, 12.) Defendants Brannan and Foust then returned to the office and talked and laughed with Defendant Rutledge, and they ordered a search of Plaintiff's cell "in retaliation." (*Id.* at 8.)

Later that morning, Plaintiff spoke with Defendant Smith from the Office of Inspector General. (Dkt. #1 at 8.) He told Smith about the assault by Foust and Brannan and showed Smith

his busted lip, marks from the handcuffs, and swollen finger. He asked for medical attention, but Smith simply responded, "I really didn't want to hear this" and went to the office to talk to Foust, Rutledge, and Brennan. When Smith exited the office, Plaintiff asked again about medical attention, and Smith responded, "they are going to take care [of] medical for you." (*Id.*)

Approximately an hour later, Warden Mitchell visited the area and Plaintiff told him about the use of force. (Dkt. #1 at 8.) Defendant Mitchell did not come close enough to see Plaintiff's injuries, saying he was "busy checking temperature" and would "get [Plaintiff] medical." (*Id.* at 8–9.)

A few hours later, Defendant Foust told Plaintiff that he was being moved to special observation status (SOS), which entails being housed naked and under constant observation. (Dkt. #1 at 9.) When Plaintiff asked for a reason, Foust said that he would "ask Mrs. Boykin." (*Id.*) Plaintiff initially "refused this re-housing" and submitted only after Defendant Rutledge and others threatened him with physical harm, including Rutledge's holding a gas cannister and threatening to "gas your ass." (*Id.*) Plaintiff was then stripped and moved to an extremely cold cell that was covered in feces and blood, with a toilet overflowing with human waste, and no running water in the sink or toilet, where he was held for seven days. (*Id.*) During his stay there, Plaintiff was denied a mattress, water, food, tissue, and showers. (*Id.*) Officers told him those deprivations were "per captain's orders." (*Id.*)

On June 9, 2023, Defendant Issah, a medical aide, arrived at Plaintiff's cell on medical rounds. (Dkt. #1 at 9.) Plaintiff showed Issah his living conditions and injuries and told him that he was urinating blood, but Issah responded that there was nothing he could do because Plaintiff was on SOS. (*Id.* at 9–10.)

On June 13, 2023, Plaintiff asked Defendant Lakin for medical attention. (Dkt. #1 at 10.) Lakin refused, saying that Plaintiff had "brought this all on yourself" and would be fine if he would "keep [his] hands off women," because everyone knew what had happened with Officer Boykin. (*Id.*)

Upon Plaintiff's release from SOS, he was originally assigned to a cell in C-pod. (Dkt. #1 at 10.) But when Defendant Foust learned of that assignment, he told Plaintiff "naw bitch you going to F-pod [where] I can get your bitch ass shut down." (*Id.*) Plaintiff was thus moved to cell F-28, "into a less desirable part of the prison where inmates were flooding, starting fires and throwing bodily waste on one another." (*Id.*) Later, on June 23, 2024, Defendant Foust told two female officer trainees that Plaintiff was "a snitch and child molester" and that "all [Foust] need[ed] is an excuse to bust his ass." (*Id.*) Foust also encouraged other inmates to "bust this bitch ass child molester in his ass" to receive a reward from Foust. (*Id.* at 10–11.) Following these comments by Foust, multiple inmates threatened and attempted to hurt Plaintiff, but Foust and Brannan wrote false disciplinary charges against Plaintiff "to cover up their actions." (*Id.* at 11.)

Finally, Plaintiff alleges that Defendant Brannan "was notorious for abusing prisoners with excessive force," and that Defendant Warden Marshall "was aware of Brannan's previous abuse of other prisoners in custody" but nevertheless promoted Brannan to captain and put him in a position to harm Plaintiff as alleged. (Dkt. #1 at 11.)

Plaintiff claims the Defendants' actions violated his rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments. (Dkt. #1 at 14–15.) He seeks a declaration that Defendants violated his constitutional rights as well as compensatory and punitive damages. (*Id.* at 15–16.)

## II. The Parties' Briefs and Evidence

A.  Defendants' motion

Defendants assert that TDCJ has a 2-step grievance process to resolve issues relating to conditions, comprising a Step 1 grievance to prison officials and a Step 2 appeal. (Dkt. #21 at 4.) They cite case law describing the TDCJ's requirement that prisoner's file a Step 1 grievance within fifteen days of the event at issue, followed by a Step 2 appeal to state officials within fifteen days of the return of the Step 1. (*Id.*) They urge that both steps must be fully complete for a grievance to be deemed exhausted. (*Id.* at 5.)

Defendants further assert that Plaintiff failed to exhaust that grievance process with respect to the events described in his complaint. (*Id.*) They acknowledge that Plaintiff filed one relevant and four potentially relevant Step 1 grievances, but they assert that he failed to file a Step 2 appeal of any of them. (*Id.*) In support of their motion, they have filed the certified records of all Plaintiff's grievances from June 1, 2023 through December 19, 2023.[3] (Dkt. #21 at 2; Dkt. #21-1.) The records consist of 126 pages of grievances and related internal investigations, many of which concern matters not relevant to this case. In pertinent part, the records contain the following grievances:

1. Step 1 Grievance 2023119865, dated June 14, 2023, and received by staff on June 19, 2023, in which Plaintiff complained about "threats and comments of a sexual nature made by Captain Brennan and Lt. Foust" on June 7, 2023. This grievance was returned to Plaintiff on July 26, 2023, with a response from Warden Marshall that the matter

---

[3] While Defendants' motion specifies the date range for the grievance file produced, the custodian's affidavit does not. (Dkt. #21-1 at 2.) Further, the affidavit contains information not decipherable by the Court, including a reference to topic "011." (*Id.*) This is not the first occasion on which the Court has recently encountered similar deficiencies in grievance custodian affidavits submitted by counsel for TDCJ defendants. *See* Order to Supplement, *Butler v. Collier*, No. 6:22-347 (E.D. Tex. Jun. 20, 2023) (affidavit materially relied on unexplained codes); Order to Correct Affidavit, *Bryant v. Pedro*, No. 6:22-137 (E.D. Tex. Jun. 15, 2023) (affidavit swore to incorrect date range). While the deficiencies in this case are not material to the Court's analysis, counsel is advised in future to thoroughly review such affidavits and ensure that they are suitable for their purpose.

was investigated, his claims were uncorroborated, and no wrongdoing was found. (Dkt. #21-1 at 17–18.)

2. A second Step 1 Grievance form also dated June 14, 2023, complained again about the June 7 threats and comments by Brennan and Foust. It was returned without processing as redundant to Grievance 2023119865.

3. Step 1 Grievance 2023121016, dated June 14, 2023, and received by staff on June 21, 2023, in which Plaintiff complained about being taken to the office about a PREA complaint on June 6, 2023, where, with Brannan present, Foust yelled at Plaintiff to sit down, slapped him in the face, pushed him into the chair and then onto the floor, and pushed his knee in the back of Plaintiff's head, causing him to lose consciousness. Plaintiff claimed he awoke to Brannan's kicking him in the stomach and privates and threatening him that he would not leave alive if Brannan had to do any more paperwork about his PREA complaints. Foust then placed Plaintiff in a chair, spat in his face, and threatened him. Plaintiff asked for medical attention and was refused. He was placed on SOS in a cell covered with feces and blood, with no clothing or mattress and a non-functioning toilet. His cell flooded when it rained, he was "at times" denied food and water "per captain's orders," and he remained in those conditions for seven days. He said he had still not received medical attention despite his reports of urinating blood. This grievance was returned to Plaintiff on July 5, 2023, with a response from Warden Marshall that the Office of the Inspector General had determined not to open an investigation and no further action was warranted. (Dkt. #21-1 at 28–29.)

4. Step 1 Grievance 2023122081, dated June 21, 2023, and received by staff on June 23, 2023, in which Plaintiff complained of verbal threats made by Foust on June 13, 2023. That grievance was returned to Plaintiff on June 30, 2023, with a response from Warden Marshall that investigation did not substantiate Plaintiff's claims and no further action was warranted. (Dkt. #21-1 at 50–51.)

5. Step 1 Grievance 2023126231, dated July 1, 2023, and received by staff on July 5, 2023, in which Plaintiff complained of comments made by Foust on June 23, 2023, including announcing that Plaintiff was a pervert and a child molester, that Foust just wanted a reason to "bust his ass," and promising a cell phone to anyone who harmed Plaintiff. This grievance was returned to Plaintiff on July 28, 2023, with a response from Warden Marshall that investigation found his claims to be unsubstantiated and no further action was warranted. (Dkt. #21-1 at 61–62.)

6. In a Step 1 Grievance dated July 7, 2023, Plaintiff complained about Foust's comments that Plaintiff was a snitch and child molester who had beaten a female guard and inviting others to do "something" to him and "get him." Plaintiff stated that Foust made the comments on June 2, 2023. The grievance was returned to him unprocessed on July 10, 2023, because the "[g]rievable time period ha[d] expired." (Dkt. #21-1 at 107–08.)

7. Step 1 Grievance 2023130898, dated July 12, 2023, and received by staff on July 14, 2023, in which Plaintiff complained of comments by Foust on July 2, 2023, that Plaintiff was a snitch and a child molester who had beaten a female guard, and inviting anyone to harm him. Plaintiff said these comments resulted in his receiving threats from other inmates. The grievance was returned to Plaintiff on or around October 2, 2023,

with a response from Warden Marshall that his claims were unsubstantiated and no further action was warranted.

The grievance file also contains two Step 2 grievance appeals. (Dkt. #21-1 at 115, 121.) However, those grievances pertain to Plaintiff's unrelated complaints about sinus issues and destruction of his property. (*Id.*) Neither of them relates in any way to the Step 1 grievances relevant to this case.

Defendants argue that the availability of administrative procedures is obvious from the record of Plaintiff's grievances and staff's investigations and responses. (Dkt. #21 at 5–6.) They seek summary judgment due to Plaintiff's failure to exhaust those procedures.

B.  Plaintiff's response and Defendants' reply

Plaintiff's response is asserted to be true and correct under penalty of perjury (Dkt. #22 at 2), so the Court considers it among the summary judgment evidence in the record. *See King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) ("A plaintiff's verified complaint can be considered as summary judgment evidence to the extent that it comports with the requirements of Fed. R. Civ. P. 56(e)."). In it, Plaintiff asserts that "[o]n or about July 7, 2023," he gave two Step 1 grievances and a Step 2 grievance to a white male correctional officer possibly named Thompson. (*Id.* at 1.) Plaintiff saw the officer give the grievances to the grievance coordinator, M. Lakin. (*Id.*) The Step 2 and one of the Step 1 grievances were "in relation to a unecessary [sic] use of force and denial of medical attention by defendants Issah, Brannan, and Foust." (*Id.*) The second Step 1 grievance "was in relation to denial of medical attention and failure to intervene by defendants Mitchell, Lakin, Foust, Brannan, Smith, Issah, Ruthledge." (*Id.* at 2.)

Plaintiff asserts that he was transferred to Ferguson Unit in August 2023 and inquired about the status of Grievance 2023121016. (*Id.*) He attaches a copy of this inquiry, dated August 13, 2024, with a staff response stating that "Grievance was opened at MI Unit and closed on 7/5/23.

7

MI Unit will send to your current unit of assignment." (Dkt. #22-1.) Plaintiff says that he never received that grievance response. (Dkt. #22 at 2.) Plaintiff says that he "believe[s]" that the grievance coordinator, M. Lakin, destroyed one or more of his grievances to protect her husband, Defendant Lakin. (*Id.*) He claims that this "machination" prevented him from exhausting his administrative remedies, because prisoners may not file a Step 2 appeal if the Step 1 grievance is not returned. (*Id.*) He argues that these facts create a genuine issue of material fact regarding whether he exhausted available remedies. (*Id.*)

In reply, Defendants assert that any Step 1 grievance about the use of force, denial of medical treatment, and failure to intervene alleged to have occurred on June 6 through June 9, 2023, would have been untimely pursuant to TDCJ's rules by July 7, 2023. (Dkt. #23 at 2.) Moreover, a Step 2 appeal submitted simultaneously with a Step 1 grievance would be procedurally improper and contrary to the rule requiring a Step 2 to be submitted within fifteen days after the return of a Step 1. (*Id.*)

Defendants also argue that Plaintiff's subjective belief that the grievance coordinator destroyed his grievances and his unsupported conclusion that the grievance system was made unavailable to him are not sufficient to create a genuine issue of material fact in the face of the evidence they have presented. (*Id.* at 2.)

Finally, Defendants argue that the response Plaintiff received to his inquiry about Grievance 2023121016 is consistent with their evidence that the Step 1 grievance was investigated and returned to him on July 5, 2023, and that the investigation and return of the grievance demonstrates the availability to him of the process. (*Id.* at 3.) They repeat their request that the case be dismissed in its entirety for failure to exhaust. (*Id.*)

**III. Legal Standards**

A motion for summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). The Supreme Court has interpreted the plain language of Rule 56 as mandating "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*) (quoting *Celotex*, 477 U.S. at 323–25). A fact is material if it might affect the outcome of the suit under the governing law. *Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999). Issues of material fact are "genuine" only if they require resolution by a trier of fact and if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Merritt-Campbell, Inc.*, 164 F.3d at 961. If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Little*, 37 F.3d at 1075.

If the movant meets this burden, Rule 56 requires the opposing party to go beyond the pleadings and to show by affidavits, depositions, answers to interrogatories, admissions on file, or

other admissible evidence that specific facts exist over which there is a genuine issue for trial. *EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1180 (5th Cir. 1996); *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1046–47 (5th Cir. 1996). The nonmovant's burden may not be satisfied by argument, conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a mere scintilla of evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 585 (1986); *Wallace*, 80 F.3d at 1047; *Little*, 37 F.3d at 1075.

When ruling on a motion for summary judgment, the Court is required to view all justifiable inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *Merritt-Campbell, Inc.*, 164 F.3d at 961. However, the Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *as modified*, 70 F.3d 26 (5th Cir. 1995). Unless there is sufficient evidence for a reasonable jury to return a verdict in the opposing party's favor, there is no genuine issue for trial, and summary judgment must be granted. *Celotex*, 477 U.S. at 322–23; *Anderson*, 477 U.S. at 249–51; *Texas Instruments*, 100 F.3d at 1179.

**IV. Discussion and Analysis**

Congress enacted the Prison Litigation Reform Act (PLRA) in 1996, mandating that no action shall be brought by a prisoner "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). It is well-settled that inmates must exhaust any and all administrative remedies before proceeding in federal court. *See Gonzalez v. Seal*, 702 F.3d 785, 787 (5th Cir. 2012) (explaining that pre-filing exhaustion is both mandatory and non-discretionary). The purpose of the prison exhaustion requirement is to "provide administrators with a fair opportunity under the circumstances to address the problem that will later form the basis of

the suit." *See Bisby v. Garza*, 342 F. App'x 969, 971 (5th Cir. 2009); *see also Patterson v. Stanley*, 547 F. App'x 510, 511 (5th Cir. 2013) (explaining that the primary purpose of a grievance is to give prison officials fair opportunity to address the problem that will later form the basis of the lawsuit); *Johnson v. Johnson*, 385 F.3d 503, 516 (5th Cir. 2004) (interpreting the exhaustion requirement in light of its purposes, which "include the goal of giving officials time and opportunity to address complaints internally.") (internal quotations and citation omitted).

The exhaustion provision was unanimously upheld by the Supreme Court in *Booth v. Churner*, 532 U.S. 731 (2001). The Supreme Court subsequently held that exhaustion is mandatory and that the requirement will not be excused when an inmate fails to properly exhaust his administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 84 (2006). Proper exhaustion means that an inmate must not only pursue all available avenues of relief but must also comply with all administrative deadlines and procedural rules. *Id.* at 90–91. The Fifth Circuit recently reiterated the principle that "[p]re-filing exhaustion is mandatory, and the case must be dismissed if available administrative remedies were not exhausted." *Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012).

The Supreme Court elaborated further about the exhaustion requirement in *Jones v. Bock*, 549 U.S. 199 (2007). The Court explained that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Id.* at 211. The Fifth Circuit has explained the procedures to be followed with regard to claims of failure to exhaust:

> As a final matter, we now provide a brief summary of how district courts should approach exhaustion questions under the PLRA. When the defendant raises exhaustion as an affirmative defense, the judge should usually resolve disputes concerning exhaustion prior to allowing the case to proceed on the merits. If the plaintiff survives summary judgment on exhaustion, the judge may resolve disputed facts concerning exhaustion, holding an evidentiary hearing if necessary.

*Dillon v. Rogers*, 596 F.3d 260, 272–73 (5th Cir. 2010). A prisoner's failure to exhaust certain claims before filing suit in federal court is fatal to those unexhausted claims only. *See Jones*, 549

U.S. at 924 ("There is no reason failure to exhaust on one [claim] necessarily affects any other.").

All the steps in a grievance procedure must be pursued to exhaust administrative remedies. *Johnson*, 385 F.3d at 515. The TDCJ has a two-step formal grievance process, including a Step One grievance, which is handled within the facility, and a Step Two grievance appeal, which is handled at the state level. A prisoner must pursue a grievance through both steps for it to be considered exhausted. *Id.* This means that for TDCJ inmates to exhaust an issue properly, the issue must be presented in a Step One grievance and then appealed to Step Two. New issues cannot be raised for the first time in a Step Two grievance appeal and only one issue per grievance may be presented. *Randle v. Woods*, 299 F.App'x 466, 2008 WL 4933754 (5th Cir., Nov. 19, 2008); *see also* TDCJ Offender Orientation Handbook ("Handbook") at 74, available at [Texas Department of Criminal Justice, Offender Orientation Handbook](#) (last visited Jun. 4, 2024). Any grievances that are submitted after fifteen days, and any grievances that are redundant to a previous grievance, are returned to the prisoner unprocessed. Handbook at 74–75.

The evidence presented by Defendants in this case, including 126 pages of grievance records summarized in pertinent part above, establishes that Plaintiff failed to exhaust his administrative remedies about any of the claims asserted in his complaint. Plaintiff attempts to create a genuine conflict in the evidence by swearing that certain grievances he submitted on July 7 disappeared and that he never received a response to Grievance 2023121016, which covered the June 6 use of force, subsequent denial of medical care, and detention in an unsanitary cell. But Plaintiff's efforts fail for several reasons.

First, even accepting the truth of the sworn assertions in Plaintiff's response, no Step 1 grievance Plaintiff submitted on July 7, 2023, could have exhausted his remedies for the events described in the complaint. By that date, the fifteen-day deadline to file a grievance would have

12

barred every event alleged in the complaint other than the June 23 comments by Foust inviting others to harm the Plaintiff. But Plaintiff does not allege in his response that this incident was among the issues raised in the grievances he submitted on July 7. Moreover, by July 7, Plaintiff had *already* grieved those June 23 comments, in Step 1 Grievance 2023126231, dated July 1, 2023, which was returned to him on July 28, 2023. (Dkt. #21-1 at 61–62.) Accordingly, the record establishes that any grievance submitted on July 7 about any of the events at issue in this lawsuit would have been returned unprocessed as either untimely or redundant to a previous grievance. (*See* Dkt. #21-1 at 101–02 (returning grievance dated June 14 about June 7 threats by Brannan and Foust as redundant to Grievance 2023119865), 107–08 (returning grievance dated July 7 about June 2 comments by Foust as untimely).) As explained above, grievances that do not comply with applicable regulations do not constitute exhaustion under the PLRA.

And, as Defendants' reply suggests, any Step 2 grievance submitted on July 7, 2023, would only be procedurally proper if it was submitted within fifteen days after and in response to an adverse Step 1 response. Plaintiff does not identify any Step 1 grievance response his July 7 Step 2 submission was intended to appeal. Accordingly, his sworn statement does not establish that he filed a proper Step 2 appeal pertaining to any of the claims in this case.[4]

Finally, Plaintiff's self-serving testimony that Grievance 2023121016 was never returned to him is the sort of scintilla of evidence that cannot create a genuine issue of fact in light of the record as a whole. *See Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) ("[T]he

---

[4] The Court is not required to search the record for facts in Plaintiff's favor, but a review of the evidence disproves that any July 7 Step 2 grievance would have exhausted Plaintiff's remedies. The record indicates that Grievance 2023121016 was returned to Plaintiff on July 5, 2023 (Dkt. #21-1 at 28–29), but his denial of receipt of that response defeats any inference the Court might otherwise have made that the July 7 Step 2 appeal was from that grievance response. The record also indicates that Grievance 2023122081, about Foust's alleged comments on June 13, was returned to Plaintiff on June 30 (Dkt. #21-1 at 50–51); but again, Plaintiff does not assert that any of Foust's comments or threats were among the topics of the July 7 grievances that allegedly went missing.

nonmovant cannot satisfy its burden with 'conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence.'"). The Court may not make a credibility determination or weigh the parties' evidence at this stage. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). But there is no genuine issue for trial if the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *Prison Legal News v. Livingston*, 683 F.3d 201, 211 (5th Cir. 2012); *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 328 (5th Cir. 2017) (genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party).

Plaintiff's subjective belief that the grievance coordinator destroyed any grievances is not an admissible fact to which he can competently testify. Moreover, it is rendered totally implausible by the sheer volume of Plaintiff's grievances in the record and the seriousness with which they were handled. Grievance 2023121016, for example, is accompanied by almost twenty pages of worksheets and investigation material, including a completed and detailed emergency grievance checklist, multiple emails between staff, an investigation report reflecting interviews of staff and an attempt to interview Plaintiff (who refused to speak to investigator Sammy Polk), a PREA investigation review, and signatures dated June 30, 2023, indicating review by a regional or central office supervisor, an OIG supervisor, and the grievance coordinator (Dkt. #21-1 at 30–49.) This comprehensive documentation concludes with the notation that the grievance response was given to Plaintiff on July 5, 2023. (*Id.* at 28.) No reasonable fact-finder reviewing all the evidence could find that the grievance coordinator destroyed or simply failed to return this grievance or any grievance(s) relevant to this case.

RECOMMENDATION

Accordingly, the undersigned recommends that Defendants' motion for summary judgment (Dkt. #21) be **GRANTED** and that summary judgment enter in Defendants' favor due to Plaintiff's failure to exhaust administrative remedies.

Within fourteen (14) days after receipt of the Magistrate Judge's Report, any party may serve and file written objections to the findings and recommendations contained in the Report. A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

**So ORDERED and SIGNED this 10th day of June, 2024.**

*[Signature]*
JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE